IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

JOSHUA PARNELL,

      Plaintiff,

v.

                        CIVIL ACTION FILE NO.:
                        4:14-CV-0024-HLM

WESTERN SKY FINANCIAL,
LLC, d/b/a Western Sky Funding,
Western Sky, WesternSky.com,
MARTIN A. ("BUTCH") WEBB, and
CASHCALL, INC.

      Defendants.

## ORDER

This case is before the Court on the Renewed Motion

to Dismiss Based on Forum Non Conveniens ("Motion to

Dismiss") filed by Defendant CashCall, Inc. ("Defendant

CashCall") [18] and on Defendant CashCall's Renewed

Motion to Compel Arbitration and Dismiss or Stay Action ("Motion to Compel") [19].

## I.    Background

### A.    Procedural Background

On December 6, 2013, Plaintiff filed this lawsuit in the Superior Court of Whitfield County, Georgia. (Docket Entry No. 1-3 at 1.) On February 12, 2014, Defendant CashCall removed the case to this Court. (Docket Entry No. 1.) On March 4, 2014, Plaintiff filed a First Amended Complaint. (Docket Entry No. 12.) Plaintiff asserted a claim for violation of the Georgia Payday Lending Act, O.C.G.A. § 16-17-2. (Am. Compl. (Docket Entry No. 12) ¶¶ 107-127.)

On March 18, 2014, Defendant CashCall filed its Motion to Dismiss. (Docket Entry No. 18.) The briefing

2

process for that Motion is complete, and the Court finds that the matter is ripe for resolution.

Defendant CashCall also filed its Motion to Compel on March 18, 2014.   (Docket Entry No. 19.)   The briefing process for that Motion is complete, and the Court finds that the matter is ripe for resolution.

## B.   Plaintiff's Allegations

### 1.   The Parties

Plaintiff resides in Tunnel Hill, Georgia. (Am. Compl. ¶ 7.)   Defendant Western Sky Financial, LLC ("Defendant Western Sky") is a South Dakota limited liability company with its principal place of business in Timber Lake, South Dakota.  (Id. ¶ 8.)  Plaintiff alleges that Defendant Western Sky "transacts business in Georgia . . . by offering, making,

3

and collecting payments on payday loans to consumers in Georgia."  (Id. ¶ 11.)

Defendant Martin A. "Butch" Webb ("Defendant Webb") resides in South Dakota.  (Am. Compl. ¶ 15.)  Defendant Webb is Defendant Western Sky's sole owner, executive officer, and registered agent.  (Id. ¶ 16.)  Plaintiff alleges that Defendant Webb "transacts business in Georgia . . . by offering, making, and collecting payments on payday loans to consumers in Georgia."  (Id. ¶ 18.)

Defendant CashCall is a California corporation with its principal place of business in Anaheim, California.  (Am. Compl. ¶ 22.)  Plaintiff alleges that Defendant CashCall "transacts business in Georgia . . . by offering, originating,

4

servicing, and collecting payments on payday loans to consumers in Georgia." (Id. ¶ 24.)

## 2.   Defendants' Business

According to Plaintiff, Defendant Western Sky makes "personal, unsecured loans over the internet to consumers in Georgia and throughout the United States." (Am. Compl. ¶ 28.)  Plaintiff alleges that "[c]onsumers apply for small loans or payday loans through a call center, [Defendant] CashCall's website, or www.westernsky.com." (Id. ¶ 29.)

According to Plaintiff, Defendant CashCall "provides website hosting and support services for [Defendant] Western Sky," and "reimburses [Defendant] Western Sky for all costs of maintenance, repair and/or update costs associated with [Defendant] Western Sky's server." (Am.

AO 72A

(Rev.8/8
2)

Compl. ¶ 30.)  According to Plaintiff, Defendant CashCall "reimburses [Defendant] Western Sky for its office, personnel, and postage and provides [Defendant] Western Sky with a toll free telephone and fax number." (Id. ¶ 31.) Defendant CashCall also allegedly "provides an array of marketing services to [Defendant] Western Sky, including but not limited to creating and distributing print, internet, television, and radio advertisements and other promotional materials." (Id. ¶ 32.)

Once an application for a loan is received, Defendant CashCall "reviews the application for underwriting requirements." (Am. Compl. ¶ 33.) Once the application is approved, "[Defendant] Western Sky executes a promissory note and debits a so-called 'Reserve Account' to fund the

6

promissory note." (Id. ¶ 34.)  According to Plaintiff, "[t]he Reserve Account is a demand-deposit bank account set up in the name of [Defendant] Western Sky which carries a balance equal to the full value of two days[' worth of] promissory notes calculated on the previous month's daily average." (Id. ¶ 35.)  Under Defendants' agreement, Defendant CashCall must "set up, fund, and maintain the balance in the Reserve Account," and "[t]he initial balance in the Reserve Account must be $100,000." (Id. ¶ 36.)

According to Plaintiff, "[a]fter a loan is funded, [Defendant] CashCall is obligated by agreement to purchase the promissory note from [Defendant] Western Sky." (Am. Compl. ¶ 37.) Defendants' agreement "provides that [Defendant] Western Sky can debit the Reserve

7

Account in payment for these purchased promissory notes at the end of every business day." (Id. ¶ 38.)  Although "[t]he timeframe for when the purchase occurs is not specified in any agreement," Plaintiff alleges that "consumer complaints indicate that [Defendant] CashCall generally makes contact with the consumer within one business day of the consumer filing an application for the small loan or payday loan." (Id. ¶ 39.)  Defendant Western Sky does not accept consumer payments for the notes.  (Id. ¶ 40.)

According to Plaintiff, "[a]s compensation for services provided, [Defendant] Western Sky pays [Defendant] CashCall 2.02% of the face value of each approved and executed loan transaction plus any additional charges with a net minimum payment of $100,000 per month." (Am.

8

Compl. ¶ 41.)  Plaintiff also alleges that "in consideration for the terms of the agreement setting up the Reserve Account, [Defendant] CashCall agrees to pay [Defendant] Western Sky 5.145% of the face value of each approved and executed loan credit extension and/or renewal." (Id. ¶ 42.) Defendant CashCall also "pays [Defendant] Western Sky a minimum monthly administration fee of $10,000." (Id. ¶ 43.)

According to Plaintiff, under Defendants' agreement, Defendant CashCall "agrees to indemnify [Defendant] Western Sky for all costs arising or resulting from any and all civil, criminal, or administrative claims or actions, including but not limited to fines, costs, assessments, and/or penalties which may arise in any jurisdiction." (Am. Compl. ¶ 44.)  Defendant CashCall also has responsibility "for

9

tracking all consumer complaints regarding these payday and small loans and notifying [Defendant] Western Sky of these complaints." (Id. ¶ 45.)

According to Plaintiff, "Defendants have taken substantial steps to conceal this business scheme from consumers and state and federal regulators." (Am. Compl. ¶ 46.) Plaintiff contends that Defendant Western Sky "does not identify its relationship with [Defendant] CashCall or WS Funding on its website or in any marketing materials." (Id. ¶ 47.)

Plaintiff alleges that "[t]he promissory notes identify the 'lender' as [Defendant] Western Sky with [an] address of Timber Lake, South Dakota." (Am. Compl. ¶ 48.) Plaintiff further contends that "[t]he promissory notes state that the

10

loan agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." (Id. ¶ 49 (internal quotation marks and citation omitted).)

Plaintiff alleges that although "[Defendant] Western Sky holds itself out to the public as a stand alone tribal entity which provides small loans and payday loans to consumers," that is not the case in reality. (Am. Compl. ¶ 50.) Specifically, Plaintiff alleges that Defendant CashCall: (1) "creates all advertising and marketing materials for [Defendant] Western Sky and reimburses [Defendant] Western Sky for administrative costs" (id. ¶ 50); (2) "reviews consumer applications for underwriting requirements" (id. ¶ 51); (3) "funds the loans" (id. ¶ 52); and (4) "services the

11

loans" (id. ¶ 53).   According to Plaintiff, "[Defendant] Western Sky does not receive any payment from consumers for the loans."  (Id. ¶ 54.)

Plaintiff alleges that "[a]fter detailed review of [Defendants'] business scheme, the New Hampshire Department of Banking concluded that [Defendant] Western Sky is nothing more than a front to enable [Defendant] CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."  (Am. Compl. ¶ 55.)  Plaintiff contends that Defendant Webb is the sole owner and operator of Defendant Western Sky, and that Defendant Western Sky is Defendant Webb's alter ego.  (Id. ¶ 56.)

12

Defendant Western Sky's website "advertises and offers a variety of loan products, including loans of $850.00, $1,500.00, and $2,600.00." (Am. Compl. ¶ 57.) Those "loans have annual percentage rates ('APRs') of approximately 140% to 343% and initial fees of $75.00 to $500.00." (Id. ¶ 58.) The loans require that payments me "made in monthly installments, and the length of the loan[s] ranges from twelve (12) to forty-seven (47) months." (Id. ¶ 59.)

According to Plaintiff, "Georgia consumers interested in obtaining a loan from [Defendant] Western Sky complete an online application via [Defendant] Western Sky's website or call an advertised toll-free telephone number to apply." (Am. Compl. ¶ 60.) Once Defendant Western Sky receives

13

an application, it transfers the application to Defendant CashCall for underwriting. (Id. ¶ 61.) Once Defendant CashCall approves the application, it "disburses the loan funds by electronically transmitting money to the consumer's bank account located in Georgia." (Id. ¶ 62.) According to Plaintiff, "[a]s part of the loan application process, Defendants require that Georgia consumers authorize Defendants to electronically debit funds from the Georgia consumer's bank account for the scheduled monthly installment payments, which are then taken from the Georgia consumer's same bank account in Georgia." (Id. ¶ 63.) Defendant CashCall funds all the loans that Defendants offer and make to Georgia consumers. (Id. ¶ 65.)

14

Defendants are not licensed under the Georgia Industrial Loan Act ("GILA") to engage in consumer lending in Georgia, and Plaintiff contends that Defendants are not exempt from GILA.  (Am. Compl. ¶ 66.)   According to Plaintiff, "[t]he interest rates on Defendant's loan products exceed the allowable interest rate of 10% that may be charged by licensed lenders under GILA."   (Id. ¶ 67.) Plaintiff further alleges that Defendants are not banks or thrifts chartered under federal law (id. ¶ 68), that Defendants are not banks chartered under other state's laws (id. ¶ 69), and that Defendants are not insured by the Federal Deposit Insurance Corporation (the "FDIC") (id. ¶ 70).

15

According to Plaintiff, although Defendant Western Sky "operates within the boundaries of the Cheyenne River Sioux Reservation, [Defendant] Western Sky is not an arm of the Sioux Tribe." (Am. Compl. ¶ 74.) "The Sioux Tribe does not have any ownership interest or operating role in [Defendant] Western Sky." (Id. ¶ 75.) According to Plaintiff, although Defendant Webb "is a member of the Sioux Tribe," Defendant Webb "is not a tribal official and does not operate his lending business in any official tribal capacity." (Id. ¶ 76.)

Plaintiff alleges that the transactions at issue "are not subject to the Indian Commerce Clause of the United States Constitution because they were not made by an Indian tribe–they were made by a South Dakota limited liability

16

AO 72A
(Rev.8/8
2)

(LLC) company owned by one person." (Am. Compl. ¶ 9.)

Plaintiff further contends that "[a]ll of [Defendant] CashCall's

operations occur outside of the boundaries of any lands

currently recognized by the United States government as

belonging to the Sioux Tribe." (Id. ¶ 64.)

Defendants require that consumers applying for loans

electronically sign a loan agreement titled the "Western Sky

Consumer Loan Agreement" (the "Loan Agreement"). (Am.

Compl. ¶ 71.)  The Loan Agreement states that Defendant

Western Sky is the lender for the Loan.   (Id.)   The Loan

Agreement also provides, in relevant part:

> This Loan Agreement is subject solely to the
> exclusive laws and jurisdiction of the Cheyenne
> River Sioux Tribe, Cheyenne River Indian
> Reservation.  By executing this Loan Agreement,
> you, the borrower, hereby acknowledge and
> consent to be bound to the terms of this Loan

17

AO 72A

(Rev.8/8

2)

Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law of regulation shall apply to this Loan Agreement, its enforcement or interpretation.  You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement.

(Id. ¶ 72.) The Loan Agreement also contains an arbitration clause that states, in relevant part, "any dispute you have with [Defendant] Western Sky or anyone else under this loan agreement will be resolved by binding arbitration . . . which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (Id. ¶ 73.)

18

### 3.   Plaintiff's Loan

In approximately June 2012, while located in Georgia, Plaintiff saw a television advertisement for Defendant Western Sky and its website.   (Am. Compl. ¶ 77.) According to Plaintiff he "had recently completed his service with the United States Army and was in a financially complicated period, so he was interested in the short-term loans being advertised by [Defendants]."   (Id. ¶ 78.)

Using a computer located in Georgia, Plaintiff accessed www.westernsky.com and completed and submitted an online application for a loan. (Am. Compl. ¶ 79.) Within ten minutes after submitting his online loan application, Plaintiff received a phone call from a representative of Defendants Western Sky or CashCall who stated that Plaintiff had been

19

AO 72A

(Rev.8/8

2)

approved for a $1,000.00 loan. (Id. ¶ 80.) The representative told Plaintiff "to check his email for a document which would request his digital signature." (Id. ¶ 81.) Plaintiff received a document titled "Western Sky Consumer Loan Agreement" dated June 6, 2012 (the "Parnell Loan Agreement"). (Id.)

> The Parnell Loan Agreement states, in relevant part:
>
> [Plaintiff] further agree[s] that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

(Id. ¶ 82.) The Parnell Loan Agreement stated that Plaintiff would receive a $1,000 loan, pay a prepaid

AO 72A
(Rev.8/8
2)

finance/origination charge of $500.00, and pay interest of 149.00 percent per annum. (Id. ¶ 83.) The Truth in Lending Act Disclosure Statement for the Parnell Loan Agreement further states that the annual percentage rate is 232.99 percent, the finance charge is $3,905.56, and that the total payments are $4,905.56.   (Id. ¶ 84.)   The Parnell Loan Agreement provided for Plaintiff to make an initial payment of $149.00 by July 1, 2012, followed by twenty-four monthly payments of $198.19 beginning on August 1, 2012.  (Id. ¶ 85.)

Plaintiff digitally signed the Parnell Loan Agreement. (Am. Compl. ¶ 86.)   Within seventy-two hours, Plaintiff received a $1000.00 direct deposit into his Georgia bank account.  (Id.)

AO 72A

(Rev.8/8

2)

In June 2012, Plaintiff received a notice from Defendant CashCall indicating that Defendant CashCall was servicing the loan, and that Plaintiff should make all his payments to Defendant CashCall. (Am. Compl. ¶ 87.) Plaintiff made all his payments to Defendant CashCall. (Id. ¶ 88.)

According to Plaintiff, the Parnell Loan Agreement is unconscionable because: (1) its 232.99 percent interest rate is usurious (Am. Compl. ¶ 128); (2) the choice of law and jurisdiction violates Georgia public policy and O.C.G.A. § 16-17-2(c)(1) (id.); (3) the forum selection clause is unconscionable because the selected forum would deprive Plaintiff of his day in court (id.); (4) given the amount in controversy, arbitration is prohibitively expensive to Plaintiff

AO 72A

(Rev.8/8

(<u>id.</u>); and (5) the Parnell Loan Agreement prohibits class actions or class-wide arbitration proceedings (<u>id.</u>).

## C.   Affidavit of Tawny Lawrence

Defendant CashCall submitted the Affidavit of Tawny Lawrence in support of its Motion to Dismiss.  (Aff. of Tawny Lawrence (Docket Entry No. 18-5).)  In that Affidavit, Ms. Lawrence states that Defendant Webb, a member of the Cheyenne River Sioux Tribe, owns Defendant Western Sky. (<u>Id.</u> ¶ 3.)  According to Ms. Lawrence, Defendant Western Sky's offices are located on the Cheyenne River Indian Reservation.  (<u>Id.</u>)  Ms. Lawrence further states that "[a]ll loan agreements entered into by [Defendant] Western Sky with borrowers are explicitly governed by and subject to the laws of the Tribe."  (<u>Id.</u> ¶ 4.)

23

According to Ms. Lawrence, Defendant Western Sky "consummated these loans within the boundaries of the [Cheyenne River Indian] Reservation" and later sold the loans to WS Funding, LLC, to be serviced by Defendant CashCall. (Lawrence Aff. ¶ 5.) Although Defendant Western Sky outsourced certain operational functions to Defendant CashCall, Ms. Lawrence contends that Defendant Western Sky always "set the underwriting criteria by which potential borrowers were reviewed and made the ultimate decision of whether to extend a loan." (Id.) According to Ms. Lawrence:

> The critical final steps to accept loan agreements and fund loans all occurred on the [Cheyenne River Indian] Reservation. This included a final auditing review, performed after the borrower has completed a loan application by electronically signing a loan agreement, to verify that the

24

information provided by the prospective borrower, such as regarding employment, was accurate and complete.  If the information was not accurate or complete, the agreement would not be accepted and the loan would not be funded.  If the information was satisfactory to [Defendant] Western Sky, [Defendant] Western Sky would notify its bank to fund the loan from one of [Defendant] Western Sky's bank accounts, none of which were located in Georgia.

(Id.)

## II.   Motion to Dismiss

### A.   General Standards Governing Forum-Selection Clauses

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of <u>forum non conveniens</u>." <u>Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.</u>, 134 S. Ct. 568, 580 (2013).   "[C]ourts should evaluate a forum-selection

25

clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." Id.

Where the parties' contract contains a valid forum selection clause, a court must adjust its analysis in three ways. Atl. Marine Constr. Co., 134 S. Ct. at 581. "First, the plaintiff's choice of forum merits no weight." Id. "Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." Id.

"Second, a court evaluating a . . . motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests." Atl. Marine Constr. Co., 134 S. Ct. at 582. "When parties agree to a

26

forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."  Id.  "A court ordinarily must deem the private-interest factors to weigh entirely in favor of the preselected forum."  Id.  Consequently, "a district court may consider arguments about public-interest factors only."  Id.

"Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a . . . transfer of venue will not carry with it the original venue's choice-of-law rules."  Atl. Marine Constr. Co., 134 S. Ct. at 582.  In some situations, this factor "may affect public-interest considerations."  Id.

27

"[T]he same standards should apply to motions to dismiss for <u>forum non conveniens</u> in cases involving valid forum-selection clauses pointing to state or foreign forums." <u>Atl. Marine Constr. Co.</u>, 134 S. Ct. at 583 n.8. "[F]ederal law . . . must be applied to determine the effect of forum selection clauses." <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 810 F.2d 1066, 1068 (11th Cir. 1987).[1]

"[A] forum selection clause is prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." <u>Kostelac v. Allianz Global Corp. & Specialty AG</u>, 517 F. App'x 670, 675 (11th Cir. 2013)

---

[1]The Court consequently need not, and does not, address Plaintiff's contention that the forum selection clause violates Georgia law.

28

(internal quotation marks and citation omitted) (per curiam).

"Forum-selection clauses will be enforced unless the plaintiff makes a strong showing that (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the provisions would contravene a strong public policy." Id. (internal quotation marks and citation omitted).  "In the context of non-negotiated forum-selection clauses, the fundamental fairness inquiry may be broader." Liles v. Ginn-LA West End, Ltd., 631 F.3d 1242, 1254 n.19 (11th Cir. 2011). "For example, forum-selection clauses contained in form

29

passage contracts may be unenforceable if they are the product of a bad-faith motive such as a means of discouraging cruise passengers from pursuing legitimate claims." Id. (internal quotation marks and citation omitted).

When determining whether a forum-selection clause is invalid based on fraud and overreaching, the Court first determines whether the clause was negotiated. Kostelac, 517 F. App'x at 676.    A party seeking to avoid a forum-selection clause based on fraud "must specifically allege that the forum selection clause was included in the agreement because of fraud." Xena Invs., Ltd. v. Magnum Fund Mgmt. Ltd., 726 F.3d 1278, 1285 (11th Cir. 2013). "The burden is on the party resisting the enforcement of a forum selection clause to establish fraud or inequitable

30

conduct sufficient to bar enforcement of the clause."

Cornett v. Carrithers, 465 F. App'x 841, 843 (11th Cir. 2012)

(per curiam).

To avoid a forum-selection clause based on inconvenience or unfairness of the chosen forum, "a plaintiff must show that litigating in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." Rucker v. Oasis Legal Fin., LLC, 632 F.3d 1231, 1237 (11th Cir. 2011) (internal quotation marks and citation omitted). A chosen forum will deprive a plaintiff of a remedy if "the nature of the other forum's law which the clause would require to be applied would necessarily preclude recovery for the plaintiff." Fred Lurie Assocs., Inc. v. Global Alliance

31

Logistics, Inc., 453 F. Supp. 2d 1351, 1355 (S.D. Fla. June 26, 2006).

## B.   Whether the Forum-Selection Clause in this Case is Valid

Defendant argues that the Court must dismiss this case based on the Parnell Loan Agreement's forum-selection clause.   For the following reasons, the Court rejects that argument and finds that the forum-selection clause is unenforceable.

### 1.   Fraud or Overreaching

First, Plaintiff has made a sufficient showing that the forum-selection clause was included in the Parnell Loan Agreement as a result of fraud and overreaching.[2]   As an

---

[2]The Court interprets Plaintiff's challenge as an attack on the forum selection clause itself, not merely an attack on the Parnell Loan Agreement as a whole.

32

initial matter, the forum-selection clause is not the product of arms'-length negotiations.   Defendants themselves placed the forum-selection clause into the Parnell Loan Agreement and instructed Plaintiff to sign it in order to receive his loan.

Moreover, the factual background statements set forth in the Parnell Loan Agreement are blatantly false, including the contentions that Plaintiff executed the Loan Agreement as if Plaintiff "were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation" and the contention that the Agreement was "fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation."

33

AO 72A

(Rev.8/8

2)

(Mot. Dismiss Ex. A (Docket Entry No. 2-2).)[3]  Plaintiff's

Complaint alleges that the advertisements for the loans

occurred in Georgia, Plaintiff applied for the loan via his

computer located in Georgia, and the money transfers

occurred between Plaintiff in Georgia and Defendants in

California and South Dakota.

Third, it is clearly apparent that Defendants included

the forum-selection clause in the Parnell Loan Agreement

in bad faith--as a means of discouraging borrowers from

pursuing legitimate claims or as a means to escape

_____

[3]Ms. Lawrence's affidavit does not warrant changing this conclusion.  Clearly, Plaintiff was not physically present inside the boundaries of the Cheyenne River Sioux Indian Reservation when he executed the agreement. Moreover, even if Defendant Western Sky performed some review activity within the Cheyenne River Indian Reservation before accepting the loan, it is far from clear that the Cheyenne River Sioux Indian Reservation would be the place where the agreement was made.

34

regulation by state agencies.  <u>Liles</u>, 631 F.3d at 1254 n.19.

Indeed, the New Hampshire Banking Department observed:

"[I]t appears that [Defendant] Western Sky is nothing more

than a front to enable [Defendant] CashCall to evade

licensure by state agencies and to exploit Indian Tribal

Sovereign Immunity to shield its deceptive business

practices from prosecution by state and federal regulators."

(Am. Compl. Ex. B at 5.)   The Court declines to reward

Defendants' efforts.

For the reasons discussed above, the Court finds that

the forum-selection clause is unenforceable based on fraud

and overreaching.   The Court consequently declines to

enforce the forum-selection clause.

AO 72A
(Rev.8/8
2)

## 2.   Chosen Forum

Alternatively, the Court finds that the forum-selection clause is unenforceable based on inconvenience and unfairness of the chosen forum.  Defendants have selected the Cheyenne River Sioux Tribal Court as the proper forum for all disputes arising out of Loan Agreements.  As discussed infra, that forum is, for all practical intents and purposes, unavailable to Plaintiff because the Cheyenne River Sioux Tribal Court would not have jurisdiction to entertain this dispute.

Native American "tribes do not, as a general matter, possess authority over non-Indians who come within their borders."  Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 328 (2008); see also Montana v.

36

<u>United States</u>, 450 U.S. 544, 565 (1981) ("[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.").   Two exceptions exist to this rule and provide "circumstances in which tribes may exercise civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." <u>Plains Commerce Bank</u>, 554 U.S. at 329 (internal quotation marks and citation omitted).  First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." <u>Montana</u>, 450 U.S. at 565. Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands

37

within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566. Those "exceptions concern regulation of the activities of nonmembers or the conduct of non-Indians on fee land." Plains Commerce Bank, 554 U.S. at 330 (internal quotation marks omitted). The "exceptions are limited ones, and cannot be construed in a manner that would swallow the rule, or severely shrink it." Id. (internal quotation marks and citations omitted). Indeed, "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are presumptively invalid." Id. (internal quotation marks and citation omitted); see also Phillip Morris USA, Inc. v. King Mountain Tobacco Company, 569 F.3d 932, 938 (9th Cir.

38

2009) ("Outside of [the] two exceptions, . . . the tribes'
inherent sovereignty does not give them jurisdiction to
regulate the activities of nonmembers.").

The United States Court of Appeals for the Ninth Circuit
explained:

> As a general rule, tribes do not have jurisdiction,
> either legislative or adjudicative, over
> nonmembers, and tribal courts are not courts of
> general jurisdiction. Nevertheless, stemming from
> their inherent sovereignty, tribes do have
> legislative jurisdiction within the two <u>Montana</u>
> exceptions. The <u>Montana</u> framework is applicable
> to tribal adjudicative jurisdiction, which extends no
> further than the <u>Montana</u> exceptions.

<u>Philip Morris USA, Inc.</u>, 569 F.3d at 939.

The Court finds that the first <u>Montana</u> exception does
not apply here.   As previously noted, notwithstanding
Defendant CashCall's arguments to the contrary, the events

39

at issue clearly did not occur on the Cheyenne River Indian Reservation, and Plaintiff did not engage in activity on the reservation. Moreover, Plaintiff and the corporate entities of Defendants Western Sky and CashCall are not members of the Cheyenne River Sioux Tribe. At best, only Defendant Webb is a member of the Cheyenne River Sioux Tribe, and he simply is a member of Defendant Western Sky, a limited liability company.[4] Further, given Plaintiff's allegations, it is

---

[4]The Court finds unpersuasive Defendant CashCall's contention that "as a result of sharing their owners' identities, Indian-owned companies also enjoy the privileges of tribal membership." (Br. Supp. Mot. Dismiss (Docket Entry No. 18-1) at 22.) All of the cases that Defendant CashCall cited in its initial brief in support of that contention involve tax immunity, which is a completely different issue from the contract claim presented in this case. See Pourier v. S.D. Dep't of Revenue, 658 N.W.2d 395, 404 (S.D. 2003) ("[A] corporation owned by the tribe or an enrolled tribal member residing on the Indian reservation and doing business on the reservation for the benefit of reservation Indians is an enrolled member for the purpose of protecting tax immunity."), aff'd in part, vacated in part on other grounds, 674 N.W.2d 314 (S.D. 2004); see

AO 72A
(Rev.8/8
2)

apparent that Defendant Webb did not act on behalf of the tribe.   Moreover, even if Plaintiff had some consensual contacts with the Cheyenne River Sioux Tribe, the mere existence of those contacts would not give rise to jurisdiction in the Cheyenne River Sioux Tribal Court. See Phillip Morris USA, Inc., 569 F.3d at 942 ("The mere fact that a nonmember has some consensual commercial contacts with a tribe does not mean that the tribe has jurisdiction over all suits involving that nonmember, or even

---

also Confederated Tribes of Chehalis Reservation v. Thurston Cnty. Bd. of Equalization, 724 F.3d 1153, 1157 (9th Cir. 2013) (finding that question of immunity from county property tax assessments did not turn on Indian tribe's decision to transfer ownership of lodge to limited liability company owned in part by the tribe).  To the extent that Defendant CashCall relies on Heldt v. Payday Financial, LLC, No. Civ. 13-3023-RAL, 2014 WL 1330924 (D.S.D. Mar. 31, 2014) in support of its contention that tribal court jurisdiction exists, the Heldt court itself was skeptical concerning whether a limited liability company could enjoy the privileges of tribal membership.  2014 WL 1330924, at *12.

41

over all such suits that arise within the reservation; the suit must also arise out of those consensual contacts."). Finally, although the Court recognizes that "tribal laws may be fairly imposed on nonmembers if the nonmember consents, either expressly or through his or her actions," the Court finds that any alleged consent by Plaintiff was invalid. Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc., 715 F.3d 1196, 1206 (9th Cir. 2013); see also Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla., 999 F.2d 503, 508 (11th Cir. 1993) (stating that waiver cannot grant jurisdiction where it otherwise would not exist). Under those circumstances, the Cheyenne River Sioux Tribe cannot exercise jurisdiction over Plaintiff under the first Montana exception.

42

Nothing indicates that the second <u>Montana</u> exception would apply in this case.   Indeed, Defendant CashCall cannot credibly argue that any conduct by Plaintiff threatens or directly affects the political integrity, economic security, or health or welfare of the Cheyenne River Sioux Tribe. Under those circumstances, the Court finds that the second <u>Montana</u> exception does not apply.   <u>See</u> <u>Philip Morris USA, Inc.</u>, 569 F.3d at 943 ("[T]he second exception envisions situations where the conduct of the nonmember poses a direct threat to tribal sovereignty.").

For the reasons discussed above, the Cheyenne River Sioux Tribal Court would not have jurisdiction to entertain this action.   That court consequently is not an available

43

AO 72A

(Rev.8/8

2)

forum.[5]  The Court therefore finds that the forum-selection

clause in the Parnell Loan Agreement is unenforceable.[6]

_____

[5]Defendant CashCall argues that the tribal exhaustion doctrine applies here, and that the Court consequently must permit the Cheyenne River Sioux Tribal Court to determine whether it has jurisdiction to entertain this case. (Br. Supp. Mot. Dismiss at 21.) That doctrine, however, applies only when a party raises a colorable claim that the tribal courts have jurisdiction. Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 948 (9th Cir. 2008). For the reasons previously discussed, Defendant CashCall has not raised a colorable claim of tribal jurisdiction. The Court consequently rejects this argument.

The Court acknowledges that Heldt, which involved a similar lawsuit against Defendants, concluded that tribal court exhaustion could apply even though the court in Heldt was skeptical about the existence of tribal court jurisdiction. Heldt, 2014 WL 1330924, at *14-15.  The court in Heldt stayed that action and held it in abeyance "with a directive that the Defendants file a tribal court action within thirty (30) days hereof to present for tribal court exhaustion the question of whether trial court jurisdiction exists over the Plaintiffs." Id. at *14. Here, Defendants have not offered to file a tribal court action to determine jurisdiction, and the Court consequently declines to consider that alternative.

[6]Defendant CashCall points to an opinion from the United States District Court for the Eastern District of North Carolina to support its claim that the forum selection clause is valid. Spuller v. CashCall, Inc., No. 5:13-CV-806-D (E.D.N.C.   Mar. 5, 2014)

44

## C.   Forum Non Conveniens

Defendant CashCall seeks to enforce the forum-selection clause under the doctrine of forum non conveniens. For the reasons discussed <u>supra</u> Part II.B., the Court finds that the forum-selection clause is invalid. However, even if the Parnell Loan Agreement contained a valid forum-selection clause, the Court would decline to enforce the forum-selection clause under the doctrine of forum non conveniens.

---

(attached as Ex. 1 to the Motion to Dismiss (Docket Entry No. 18-2)). With all due respect to the <u>Spuller</u> court, <u>Spuller</u> does not provide a thorough analysis of the various doctrines at issue in this case. The Court consequently finds <u>Spuller</u> unpersuasive and declines to follow it.

AO 72A

(Rev.8/8
2)

## 1.    General Standards

"A federal court has discretion to dismiss a case on the ground of <u>forum non conveniens</u> when an alternative forum has jurisdiction to hear [the] case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." <u>Sinochem Int'l Co. Ltd. v. Maylasia Int'l Shipping Corp.</u>, 549 U.S. 422, 429 (2007) (alterations in original) (internal quotation marks and citation omitted).  "Dismissal for <u>forum non conveniens</u> reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical

46

difficulties that can attend the adjudication of a dispute in a certain locality." Id. (internal quotation marks and citation omitted). Under the forum non conveniens doctrine, [d]ismissal is appropriate when an alternative forum has jurisdiction to hear a case, and when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." McLane v. Marriott Int'l, Inc., 547 F. App'x 950, 953 (11th Cir. 2013) (per curiam) (internal quotation marks and citation omitted). Generally, the party seeking dismissal bears "the burden of persuasion as to all elements of a forum non conveniens motion." Id. (internal quotation

AO 72A
(Rev.8/8
2)

marks and citation omitted).   "To meet this burden, the defendant must demonstrate that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice."  Id. (internal quotation marks and citation omitted).

"An alternative forum is available to the plaintiff when the foreign court can assert jurisdiction over the litigation sought to be transferred."  Leon v. Millon Air, Inc., 251 F.3d 1305, 1311 (11th Cir. 2001) (internal quotation marks and citation omitted).   "Generally, a defendant satisfies [this requirement] by showing that it is amenable to process in the other jurisdiction."   Republic of Panama v. BCCI

48

Holdings (Luxembourg) S.A., 119 F.3d 935, 951 (11th Cir. 1997) (internal quotation marks and citation omitted).

"A defendant also bears the burden of proving the adequacy of the alternative forum." Leon, 251 F.3d at 1311 (internal quotation marks and citation omitted).  "[T]he Supreme Court has noted that dismissal may be improper where the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all."  Id. (internal quotation marks and citation omitted). "Courts have been strict about requiring that defendants demonstrate that the alternative forum offers at least some relief."  Id.  "However, [a]n adequate forum need not be a perfect forum, and courts have not always required that defendants do much to refute allegations of partiality and

49

inefficiency in the alternative forum." Id. (alteration in original) (internal quotation marks and citation omitted). "[W]hile [s]ome inconvenience to litigants does not indicate that a forum is inadequate, courts have said that extreme amounts of partiality or inefficiency may render the alternative forum inadequate." Id. (second alteration in original) (internal quotation marks and citation omitted).

Public interest factors relating to a forum non conveniens motion include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in

AO 72A
(Rev.8/8
2)

conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." McLane, 547 F. App'x at 958 (internal quotation marks and citation omitted).

Although it is not a dispositive factor, "[t]he need to apply foreign law . . . also favors dismissal." McLane, 547 F. App'x at 959 (alterations in original) (internal quotation marks and citation omitted); see also Membreno v. Costa Crociere S.P.A., 425 F.3d 932, 937-38 (11th Cir. 2005) ("The need to apply foreign law is a public-interest factor that mitigates strongly in favor of dismissal.").

## 2.   Application to This Case

For the reasons set forth supra Part II.B., the Cheyenne River Sioux Tribal Court is not an adequate alternative

51

forum and is not available.  As previously discussed, the Cheyenne River Sioux Tribal Court would not have jurisdiction to entertain this action.  Consequently, the Cheyenne River Sioux Tribal Court is not an adequate, available alternative forum to which the Court may transfer this case.  The Court therefore declines to dismiss this action based on forum non conveniens.

## III.  Motion to Compel

Alternatively, Defendant CashCall seeks an Order compelling arbitration.  The Court first sets forth the arbitration provision contained in the Parnell Loan Agreement, and then addresses whether this action is subject to arbitration.

52

## A.    Arbitration Provision

The Parnell Loan Agreement states, in relevant part:

**PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.** Unless you exercise your right to opt-out of arbitration in the manner described below, any dispute you have with [Defendant] Western Sky or anyone else under this loan agreement will be resolved by binding arbitration.  Arbitration replaces the right to go to court, including the right to have a jury, to engage in discovery (except as may be provided in the arbitration rules), and to participate in a class action or similar proceeding.  In Arbitration, a dispute is resolved by an arbitrator instead of a judge or jury.  Arbitration procedures are simpler and more limited than court procedures.  Any Arbitration will be limited to the dispute between yourself and the holder of the Note and will not be part of a class-wide or consolidated arbitration proceeding.

**Agreement to Arbitrate.**  You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an

AO 72A
(Rev.8/8
2)

authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

**Arbitration Defined**. Arbitration is a means of having an independent third party resolve a Dispute. A "Dispute" is any controversy or claim between you and [Defendant] Western Sky or the holder or servicer of the Note. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of this Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought (i.e. money, injunctive relief, or declaratory relief). A Dispute includes, by way of example and without limitation, any claim based upon marketing or solicitations to obtain the loan and the handling or servicing of my account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement. For purposes of this Arbitration agreement, the term "the holder" shall include [Defendant] Western Sky or the then-current note holder's employees,

AO 72A

(Rev.8/8
2)

officers, directors, attorneys, affiliated companies, predecessors, and assigns, as well as any marketing, servicing, and collection representatives and agents.

**Choice of Arbitrator.** Any party to a dispute, including a Holder or its related third parties, may send the other party written notice by certified mail return receipt requested at the address appearing at the top of this Agreement of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association . . .; JAMS . . .; or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate, including the limitations on the Arbitrator below. The party receiving notice of Arbitration will respond in writing by certified mail return receipt requested

AO 72A

(Rev.8/8 ?)

within twenty (20) days.   You understand that if you demand Arbitration, you must inform us of your demand and of the arbitration organization you have selected.   You also understand that if you fail to notify us, then we have the right to select the arbitration organization.   Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Cheyenne River Sioux Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement.

**Cost of Arbitration.**   We will pay the filing fee and any costs or fees charged by the arbitrator regardless of which party initiates the Arbitration. Except where otherwise provided by the law of the Cheyenne River Sioux Tribal Nation, each party will be responsible for its own attorneys' fees and other expenses.   Unless prohibited by law, the arbitrator may award fees, costs, and reasonable attorneys' fees to the party who substantially prevails in the Arbitration.

AO 72A

(Rev.8/8
2)

**Waiver of Rights.** YOU HEREBY AGREE THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL, TO HAVE A COURT DECIDE YOUR DISPUTE, TO PARTICIPATE IN A CLASS ACTION LAWSUIT, AND TO CERTAIN DISCOVERY AND OTHER PROCEDURES THAT ARE AVAILABLE IN A LAWSUIT. The arbitrator has the ability to award all remedies available by statute, at law, or in equity to the prevailing party, except that the parties agree that the arbitrator has no authority to conduct class-wide proceedings and will be restricted to resolving the individual disputes between the parties. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide Arbitration is to be determined solely by a court of competent jurisdiction located within the Cheyenne River[] Sioux Tribal Nation, and not by the arbitrator. If the court refuses to enforce the class-wide Arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide Arbitration, the parties agree that the Dispute will proceed in tribal court and will be decided by a tribal court judge, sitting without a jury, under applicable court rules and procedures.

**Applicable Law and Judicial Review.** THIS ARBITRATION PROVISION IS MADE

AO 72A

(Rev.8/8

PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement. The arbitrator must apply the terms of this Arbitration agreement, including without limitation the waiver of class-wide Arbitration. The arbitrator will make written findings and the arbitrator's award may be filed in the Cheyenne River Sioux Tribal Court, which has jurisdiction in this matter.   The Arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by a court upon judicial review.

**Small Claims Exception.**  All parties, including related third parties, shall retain the right to seek adjudication in a small claims tribunal in the Cheyenne River Sioux Tribal Small Claims Court for disputes within the scope of such tribunal's jurisdiction.   Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal, shall be resolved by binding arbitration.

AO 72A

(Rev.8/8

Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

**Other Provisions.**  This Arbitration provision will survive (i) termination or changes in this Agreement, the Account, or the relationship between us concerning the Account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of my Note, or any amounts owed on my account, to any other person or entity.  This Arbitration provision benefits and is binding upon You, your respective heirs, successors and assigns.  It also benefits and is binding upon us, our successors and assigns, and related third parties.  The Arbitration Provision continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy.  The Arbitration Provision survives any termination, amendment, expiration, or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing.  If any of this Arbitration Provision is held invalid, the remainder shall remain in effect.

**Right to Opt Out.**  If you do not wish your account to be subject to this Arbitration Agreement, you must advise us in writing . . . , or via e-mail. . . . You must clearly print or type your name and

59

AO 72A

(Rev.8/8

2)

account number and state that you reject Arbitration. You must give written notice; it is not sufficient to telephone us. We must receive your letter or e-mail within sixty (60) days after the date your loan funds [sic] or your rejection of Arbitration will not be effective. In the event you opt out of Arbitration, any disputes hereunder shall nonetheless be governed under the laws of the Cheyenne River Sioux Tribal Nation.

(Parnell Loan Agreement at 3-5 (emphasis and capitalization in original).)

## B.  Applicable Law

The Federal Arbitration Act, 9 U.S.C. § 1, et seq. (the "FAA") generally governs a motion to compel arbitration. 9 U.S.C. § 2 provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to

60

submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

Courts must conduct a two-step inquiry when deciding whether to compel arbitration. Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004). First, the Court must determine whether the parties agreed to arbitrate the dispute. Id. The Court must make that determination "'by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].'" Id. (alteration in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)). The Court also must undertake that

61

inquiry "against the background of a 'liberal federal policy favoring arbitration agreements.'" Id. (quoting Moses H. Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). The United States Court of Appeals for the Eleventh Circuit, however, has cautioned that "arbitration is a matter of contract [and] the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." Id.

Second, the Court must determine "whether 'legal constraints external to the parties' agreement foreclosed arbitration.'" Klay, 389 F.3d at 1200 (quoting Mitsubishi Motors Corp., 473 U.S. at 628). The party challenging enforcement of an arbitration agreement bears the burden of establishing a defense to the enforcement of the

AO 72A

(Rev.8/8 2)

agreement.  Inetianbor v. CashCall, Inc., 923 F. Supp. 2d 1358, 1362 (S.D. Fla. Feb. 15, 2013).

The FAA generally governs the validity of an arbitration agreement; however, state law generally governs whether an enforceable contract or agreement to arbitrate exists. Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1368 (11th Cir. 2005); Honig v. Comcast of Ga. I, LLC, 537 F. Supp. 2d 1277, 1283 (N.D. Ga. Jan. 31, 2008).  "Thus, in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." Caley, 428 F.3d at 1368.  "[A] court can decline to enforce an arbitration agreement under the FAA only if the [party opposing arbitration] can point to a generally applicable

63

principle of contract law under which the agreement could be revoked." Id. at 1371. "If all the provisions of the arbitration clause are enforceable, then the court must compel arbitration according to the terms of the agreement." Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1331 (11th Cir. 2005).

## C.  Application to This Case

As an initial matter, the FAA applies to the arbitration provision, because the loan at issue involved interstate commerce.  See Jenkins v. First Am. Cash Adv. of Ga., LLC, 400 F.3d 868, 874-75 (2005) (concluding that payday loan transactions involved interstate commerce; transactions occurred between Georgia resident and bank

AO 72A
(Rev.8/8
2)

located in South Dakota).[7]  The Court further finds that the claims set forth in Plaintiff's Amended Complaint constitute disputes, as defined within the arbitration provision. Consequently, if the arbitration provision is valid, then Plaintiff ordinarily would have to proceed to arbitration.

Plaintiff contends that the choice of law provision in the Parnell Loan Agreement is unconscionable and violates Georgia law.  "In deciding claims of unconscionability, Georgia courts generally consider a variety of factors, which have been divided into procedural and substantive

---

[7]GILA's provision stating that payday lending does not involve interstate commerce does not change that result.  Jenkins, 400 F.3d at 875 n.6 (citing O.C.G.A. § 16-17-1(d).)  Instead, "[c]ourts determine whether or not interstate commerce exists under the FAA on a case-by-case analysis by examining whether the transaction in question turns out, in fact, to have involved interstate commerce."  Id.

65

elements." <u>Jenkins</u>, 400 F.3d at 875. "Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." <u>Id.</u> (internal quotation marks and citation omitted). "Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." <u>Id.</u> at 875-76 (internal quotation marks and citation omitted). "As for substantive unconscionability, courts consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks

66

between the parties, and similar public policy concerns."

Id. at 876 (internal quotation marks and citations omitted).

"The FAA 'provides a remedy to a party seeking to compel compliance with an arbitration agreement.'" Jenkins, 400 F.3d at 876 (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403 (1967)). "Such a party can move the district court for an order compelling arbitration." Id. "Section four of the FAA instructs the district court to grant the motion and order arbitration once it is satisfied 'that the making of the agreement for arbitration . . . is not in issue.'" Id. (quoting 9 U.S.C. § 4). "If, however, the making of the arbitration agreement is in question, then the federal court may first adjudicate that issue." Id.

67

When interpreting Section 4 of the FAA, "the Supreme Court has distinguished between claims that challenge the contract generally and claims that challenge the arbitration provision itself." Jenkins, 400 F.3d at 876. Indeed, in Prima Paint, a plaintiff sought to rescind a contract, arguing that it was fraudulently induced. Prima Paint, 388 U.S. at 398. The defendant attempted to invoke the agreement's arbitration clause. Id. at 398-99. The Supreme Court noted: "[I]f the claim is fraud in the inducement of the arbitration clause itself--an issue which goes to the 'making' of the agreement to arbitrate--the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally." Id. at 403-04.

68

Thus, the Supreme Court held that "in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." Id. at 404. Consequently, because the plaintiff's fraudulent inducement claim related to the underlying contract generally, not to the arbitration clause specifically, the arbitrator, rather than the federal court, had to resolve that claim. Id. at 406. Further, the Eleventh Circuit has held that if "'claims of adhesion, unconscionability, . . . and lack of mutuality of obligation pertain to the contract as a whole, and not to the arbitration provision alone, then these issues should be resolved in arbitration.'" Jenkins, 400 F.3d at 877 (quoting Benoay v.

AO 72A
(Rev.8/8
2)

Prudential-Bache Secs., Inc., 805 F.2d 1437, 1447 (11th Cir. 1986)).

Here, Plaintiff's arguments concerning unconscionability appear to relate to the contract generally, not to the arbitration provision itself. Specifically, Plaintiff argues that the Parnell Loan Agreement's choice of law provision is procedurally and substantively unconscionable. (Pl.'s Resp. Mot. Compel (Docket Entry No. at 9-13.) Specifically, Plaintiff argues that the interest rate of the Parnell Loan Agreement "is clearly not a commercially reasonable rate" and that "[t]he purpose and effect of the contract terms, namely to avoid the usury rate laws of the various states – including Georgia – by masquerading as a Tribal Sovereign Nation, demonstrates in and of itself

AO 72A

(Rev.8/8

enough substantive unconscionability to set aside this Loan Agreement." (Id. at 12.)   Plaintiff also argues that the Parnell Loan Agreement presents public policy concerns, as "this Loan Agreement through fraudulent statements that it is governed by Cheyenne River Sioux Tribal law (which it clearly does not) flies in the face of the very purpose of Georgia's Payday Loan Act." (Id. (emphasis in original).) Those arguments demonstrate that Plaintiff seeks to attack the Parnell Loan Agreement as a whole, not simply the arbitration provision contained in that agreement.   Under those circumstances, Plaintiff's arguments are matters for the arbitrator to resolve.

In Jenkins, a plaintiff opposed a motion to compel arbitration on similar grounds. Jenkins, 400 F.3d at 880-81.

71

The plaintiff in <u>Jenkins</u> contended that the underlying payday loan contracts were illegal and void <u>ab initio</u>, and that she consequently should not have to proceed to arbitration. <u>Id.</u> at 880. The Eleventh Circuit rejected that argument, noting that the plaintiff did not "challenge the existence of either the payday loan contracts or the accompanying Arbitration Agreements; rather she challenge[d] the content of the contracts–i.e., the rates of interest charged in the loan agreements." <u>Id.</u> at 882. The Eleventh Circuit concluded that the "void <u>ab initio</u> argument, which challenges the legality of the payday lending transactions, is an issue for the arbitrator, not the court, to decide." <u>Id.</u> This argument consequently does not foreclose arbitration.

72

AO 72A
(Rev.8/8
2)

Plaintiff's arguments relating to the unconscionability of the arbitration provision itself, however, fare better. As previously discussed, the Cheyenne River Sioux Tribal Court would not have subject matter jurisdiction to entertain this action. The choice of forum in the arbitration provision certainly is an integral part of that provision. See <u>Inetianbor v. CashCall, Inc.</u>, No. 13-60066-CIV, 2013 WL 1325327, at *3-4 (S.D. Fla. Apr. 1, 2013) (concluding that selection of Cheyenne River Sioux Tribe as arbitrator was integral to agreement to arbitrate). Under those circumstances, the failure of the chosen forum precludes arbitration. See <u>id.</u> at *1 ("[I]f the choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern, [then] the failure of the chosen forum [will]

73

AO 72A
(Rev.8/8
2)

preclude arbitration." (second and third alterations in original) (internal quotation marks and citation omitted)).

Moreover, other courts have determined that arbitration provisions in similar contracts are unenforceable.   In Itetianbor v. CashCall, Inc., 962 F. Supp. 2d 1303, 1397 (S.D. Fla. Aug. 19, 2013), the court declined to enforce a similar arbitration provision, noting

> At the August 16, 2013 hearing, CashCall conceded that, while the [Cheyenne River Sioux] Tribe has rules concerning consumer relations-- e.g. usury statutes--it does not have any consumer dispute rules. Without such rules, it is obvious that arbitration cannot be conducted in accordance with [Tribal] consumer dispute rules as required by the arbitration agreement. Accordingly, the Court concludes that Plaintiff has provided new evidence demonstrating that 1) the arbitral forum does not exist, and 2) rules governing the purported forum do not exist.

74

Id. (second alteration in original) (internal quotation marks and footnote omitted).   Like the arbitration provision in Inetianbor, the arbitration provision in this case provides that the arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement."   (Parnell Loan Agreement at 3-4.) Because those consumer dispute rules do not exist, the arbitral forum is unavailable, and the arbitration provision is unenforceable.[8]

---

[8]Defendant CashCall submitted a portion of the Cheyenne River Sioux Tribe's Code in connection with its reply in support of its Motion to Dismiss.   (Docket Entry No. 23-2.)   Defendant CashCall offers no excuse for its failure to submit that document with its initial brief, and the Court consequently does not consider it. See Cameron v. Teeberry Logistics, LLC, 920 F. Supp. 2d 1309, 1312 n.1 (N.D. Ga. Jan. 30, 2013) (declining to consider exhibits presented for first time in reply brief); Fassina v. CitiMortgage, Inc.,

AO 72A
(Rev.8/8
2)

The fact that the arbitration provision in the Parnell Loan Agreement may allow the Parties to select the American Arbitration Association, JAMS, or another arbitration proceeding to administer the arbitration does not change this result. That provision is limited by the statement that the chosen arbitration organization's rules and procedures will apply only "to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate." (Parnell Loan Agreement at 5.) Consequently, it appears that Plaintiff is correct in his assertion that the provision does not allow a choice of arbitrator--only a choice of an arbitration administrator.

No. 2:11-CV-2901-RDP, 2012 WL 2577608, at *3 (N.D. Ala. July 2, 2012) (same).

76

(Resp. Mot. Compel at 19.)  Moreover, the Court agrees with Plaintiff that "as there is no access to the alleged Cheyenne River Sioux Tribal law, there is no way that one could determine whether [American Arbitration Association] rules or JAMS rules in any way contradict Cheyenne River Sioux Tribal law."  (Id. at 19-20.)  Under those circumstances, the additional language does not make the arbitration provision enforceable.

Moreover, the United States District Court for the Northern District of Illinois made findings of fact indicating that the arbitration provision in a similar agreement was "merely an attempt to escape otherwise applicable limits on interest charges." Jackson v. Payday Financial, LLC, No. 11 C 9288, slip op. at 6 (N.D. Ill. Aug. 28, 2013).  The court

77

noted that "the promise of a meaningful and fairly conducted arbitration is a sham and an illusion." Id.  The Court agrees with that reasoning and concludes that the arbitration provision at issue is unconscionable.

For the reasons discussed above, the Court declines to enforce the arbitration provision in the Parnell Loan Agreement.  First, the arbitral forum is unavailable, and the clause is unenforceable.  Second, the arbitration provision itself is unconscionable.  The Court consequently denies Defendant CashCall's Motion to Compel.

AO 72A

(Rev.8/8

2)

## IV.  Conclusion

ACCORDINGLY, the Court **DENIES** Defendant CashCall's Motion to Dismiss [18].   The Court **DENIES** Defendant CashCall's Motion to Compel [19].

IT IS SO ORDERED, this the 28day of April, 2014.

_____
UNITED STATES DISTRICT JUDGE

AO 72A

(Rev.8/8

2)